May it please the court, counsel. My name is Thomas Carlucci. I represent the appellant Westpac. The error below can be made plain in one simple example, and this is the example. Today I walk into a car dealer and I ask to look at a car, and the dealer tells me the car is listed at $10. I say I'm not ready to buy, and that car dealer says I've got a deal for you. I'll give you $2 right now if you come back on Friday and buy the car for $10. If you don't buy the car for $10 on Friday, you've got to give me the $2 back. That's what we're talking about here. There would be no dispute that if, in fact, on Wednesday today I bought the car for the discounted price of $8, we'd have no income. However, the government here and the court below determined by virtue of the receipt of those $2 for a period of time, there was income. And the rationale below for the determination of the fact that it was income is that Westpac had the unfettered use of that $2 and the dominion and control over that amount. Counsel, I found this case really fun to read, actually, and I agree with you that that was not a persuasive argument by the commissioner. We don't consult beforehand. I have no idea what my colleagues think. It seemed to me that if you're a cash basis taxpayer, dominion and control is the end of the story, it's income. If you're an accrual basis taxpayer, it just doesn't much matter. You have the cash, but that's not determinative of when you have income if you're accrual based. I'm with you there. Where I'm having trouble is it looks like there's no circuit court authority either way on this. Is that right? On this particular device where a purchaser, rather than a seller, is getting his discount as an upfront advance, kind of like the car dealers who give you cash, rather than as a percentage off as the purchaser pays for the goods. Your Honor, I absolutely agree. There is no authority, and that's what essentially happens. None either way, is that right? I believe that the authority in support of Westpac's position is pretty clear from the Supreme Court in both Glenshaw Glass and IPL. But I have to draw inferences. Clearly you have to draw inferences in the sense of whether or not there was dominion and control. So it's not like the grocery purchasing cooperative, or whatever you'd want to call it, is looking at a circuit court or a Supreme Court case and just shaping its transaction to fit it. Correct. The issue here is whether it was income, not when it became income. And that's really where, if you will, if you look at the second part of the error below, the Court relied on the Commissioner's argument in the line of cases called Slutty line of cases, which is if, in fact, you have a seller of services. That's the seller, though, right? That's correct. And that's what distinguishes this case. We are the buyer. And, in essence, what the government is arguing and the court below found is that a buyer of goods has income when, in fact, he receives a discount. The key here, of course, is, and what the Commissioner focused on, was that it was an advanced discount. But it doesn't eliminate the fact that it was a discount. Okay. But can I ‑‑ I want to talk to you about, like, a discount and sort of look at it two ways. Just, like, assume for a moment, say, say Sylvania usually sells a widget, go back to law school, to Westpac for $10. Sylvania, however, agrees to give Westpac a discount of $1. And it reduces Westpac's cost for the widget to $9, so that Westpac sells the widget for $11, it has $2 of income, right? No, Your Honor. And, well, if it ‑‑ you're saying that it wouldn't, ma'am? The misunderstanding here is ‑‑ But then, but everyone would agree there that the discount is an income there. Discount is not income. I think everybody agrees. Situation. But still, if they sold it, you know, between it ‑‑ their cost is $9. They sell it for $11. They made $2 of income. But the discount would not be income there, because they got the discount up front. Now, in this case, you've got Westpac's scheme is for Sylvania to give $1 discount in the form of an up front cash payment. Then Westpac then purchases the widget from Sylvania for $10 and subsequently sells for $11. Westpac, however, reduces its cost basis from the widget to $9, the purchase price of $10 less the $1. And thus, upon the sale of the widget, has a $2 ‑‑ $2 in income. Is that right? That's right. All right. But that's the type of discount. That's ‑‑ that's a little bit different than the first ‑‑ that's where we get into the dispute, right? No, Your Honor. It's the same. Under any circumstance, what happens, and the key here and where the court went wrong below, and it's an unfortunate use of words, is in order to keep the money, which is the key here, they had to give it back. That's the underlying issue here, which is, in the example I gave, when I get that $2 back from the dealer, in order for me to get the benefit of that $2 and the discount, I have to give it back. So under all circumstances, in the example I gave and in the Westpac case, they always had to give the money back. In other words, if they wanted to get the discount, regardless of what they got, they had to give it back. You had to give it back one of two ways. Either you don't have a volume purchase and you give all of the money back, or you have a volume purchase. But when you have that volume purchase, you actually have to take the money that Westpac gave you, in essence, and give it back. Thank you for that. I thought what you would do is, well, I remember my Schedule C, when I used to fill one out, I'd put revenue at the top, and then I have two adjustments. Or, well, there can be many adjustments to the cost of goods sold. Discounts that I gave, refunds that I gave. Now, I guess that wouldn't apply. That wouldn't really fit this. I'm just thinking that what you would do is reflect the dollar that you got up front as an adjustment to the cost of goods sold. That's exactly right. It's income. That's right. It's not income. You reduce your cost of goods sold. And the key here is. You're not giving it back to anybody unless you don't sell enough light bulbs, and then you have to write a check to Sylvania. Well, in essence, if you look at footnote 8 in IPL, what it says is you've got to look at the essence of the transaction. Look at what? Footnote 8 in Indianapolis Power and Light. And there it said the customer, in that situation, when it reached the end of its deposit, would simply tell IPL, go ahead and take that money and apply it to the next bill. And the Supreme Court said, okay, I understand what the Commissioner's argument. Therefore, it's income. It said, no, what really happened there is, and you've got to look beyond the transaction. And what happened in that situation was that, in essence, what happened was IPL wrote a check back for that deposit, and then the customer wrote a check back to pay that bill. Now, actually, that didn't happen, but the Supreme Court said, you really have to sort of look at the essence and understand the transaction. That's exactly what happened here. While, you know, the exact $2 I'm talking about may not have gone back, in essence, in a check to the vendor, the reality is when they purchased a product, what they did is they, in essence, wrote a check back for the amount of the advance in that amount and then their dollars. So the key here is they always had to use their dollars and couple it with the advance to get the discount. Am I right in thinking that suppose the IRS were to win this case, then your cost of goods sold would be higher because suppose you're buying $100 worth of light bulbs and you get a 10% discount and you get it up front in cash, so you get $10. Under your theory, that $10 doesn't go on your tax return until you sell the light bulbs, and then it is an adjustment to the cost of goods sold so that they cost $90 instead of $100. Under their theory, the $10 is income when received, but the cost of goods sold does not get adjusted from $100 to $90. It stays at $100. Correct, Your Honor. So your profits from those light bulbs that you sell is $10 less, and your income is reduced commensurately at the time you sell the light bulbs. Yes. Is that right? That's correct. Because that makes you like a cash basis taxpayer. I think it's different, but I do agree with the analysis. I would like to reserve the rest of my time, Your Honor. Okay. Thank you, Counsel. Counsel, before you sit down, this case is, I don't know how it happened to get weighted as a three, but it's no three. If either of my colleagues have more questions, we'll go over. Thank you, Your Honor. I guess not. Save me for later. Thanks. May it please the Court, I'm Andrea Tebitz on behalf of the Commissioner of Internal Revenue. The case that's been presented to you this morning and was presented to you in the appellant's brief is a very different case from the one that was presented to the tax court and decided by the tax court below. Mr. Carlucci has reiterated just now that the issue in this case is whether it's a three, It looked to me like it was just a different way of theorizing about the same facts and same argument. I really couldn't see anything that different. I mean, I read the tax court decision, and then I read the briefs. They're all about the same thing. The issue presented to the tax court was when the upfront cash payment should be recognized as income. The issue that was stated in Westpac's brief and has been reiterated this morning by Mr. Carlucci is whether this is income at all. The entire thrust of Westpac's arguments in appeal is whether, in fact, these payments were akin to short deposits. It's the same thing, doesn't it? I mean, whether you treat it as whether or when, what you're really talking about is whether you pay tax on the discount transmuted into cash up front when you get the cash or when you sell the light bulbs. With respect, Your Honor, if these are indeed loans or deposits or akin to loans or deposits, then they would not be taxable at all. In our view, Westpac has entirely changed the thrust of the case and of the argument. I don't get loan. Pardon? I don't get where they'd be loans or deposits. The argument has been made throughout Westpac's opening brief in the appeal and throughout its reply brief in the appeal that these are akin to loans and deposits. Akin. Akin is a very important word in what you just said. First you said whether they're loans or deposits, and then you said the argument is whether they're akin to. What they meant by that argument was if we don't sell enough light bulbs to meet the volume requirement of the discount deal, the discount deal is you buy a whole lot of light bulbs, you get 10 percent off. Or really, you sell a lot of light bulbs that you buy from us, you get 10 percent off. And they say, great, we'll take the 10 percent up front in cash. If they don't sell the volume requirement of light bulbs, then they have to pay the money back. In that sense, they're saying it's akin to a loan. But I never got that they were saying this was a loan. Only the repayment obligation would be only to the extent that they had not fulfilled the volume purchase requirement. Westpac throughout its briefing in the tax court stated that they were subject only to a contingent repayment obligation. They have now stated that they are subject to a ñ Is that just putting in more abstract words what I just said? There is, in our view, a significant difference between a contingent repayment obligation and an unconditional repayment obligation. Aren't you just putting in terms of the abstract categories what I just described as the deal? I would say not. I would say that there is a difference between receiving cash, a large amount of cash up front, which you are entitled to keep if you fulfill the terms of the contract, is a very different proposition from having an unconditional obligation to repay a sum certain. Now, Westpac has argued that the repayment obligation is unconditional because they will either repay the money by repaying it if they don't fulfill the contract or by making purchases. I think the tax court made a finding of fact that if they don't meet the volume standards, they have to pay back the cash up front discount. And they pay back to the extent that they have not fulfilled the ñ Pro rata. The pro rata. So they are indeed entitled. They do have, in the words of Indiana Power & Light, Indianapolis Power & Light, they do have some guarantee that they will be entitled to keep the money. What do you mean guarantee? It depends on whether they sell light bulbs. If they perform the contract, they keep the money. And there is ñ If a Chinese manufacturer of light bulbs comes in with light bulbs at half the price, the Sylvanians will just gather dust and they won't meet their volume requirement. It is nevertheless a condition subsequent to the making of the contract, and it's necessary to look at the obligations of the parties at the time the contract was made. It's also important to recognize that this ñ the payment in this ñ the payments that were made under these contracts, although characterized as advanced trade discounts, that's a label. The label advanced trade discount does not in and of itself carry particular tax consequences or determine the tax consequences. The tax court explained why the inventory accounting statute and regulations relied upon by the taxpayer, by Westpac, excuse me, which is not a taxpayer but a partnership, why the inventory accounting provisions of the code and regulations are inapplicable in this case. The authorities ñ the case law relied upon by Westpac below is also inapplicable. John Graff, for instance, dealt with a situation in which it's a promise of a future discount, not cash up front. Let me ask you a question I asked your opponent. Is there any circuit court authority or any Supreme Court authority on discounts that are paid as cash up front, whether they're income when received for accrual basis taxpayers? As far as I can tell, there is no binding authority on either side. We were not ñ we also found none. We found a number of tax court cases, as did the tax courts. In the tax court opinion, there's a citation to Harkins in which a kind of incentive payment was treated as income at the time received, even though certain obligations, according to the taxpayer, even though there was a contingent repayment obligation as there is here. Indianapolis Power and Light is a very different case. That was looking at a deposit, something characterized as a deposit, something treated as a deposit, something under which the ñ with respect to which the recipient had an absolute obligation to give that money back upon the request of the payor. The Supreme Court in Indianapolis Power and Light said we do not here purport to lay down a hard and fast rule for a case in which there is some genuine question about the nature of the transaction. Now, there is ñ as I've said, the Westpac has characterized this as an advanced trade discount, not as a loan or deposit. Were it a loan or deposit, they would never, under any circumstances, be able to keep any of that money. We have pointed out that although the price has evidently been discounted somewhat, there is nothing on the record to ñ It's an advanced trade discount, as you say. Instead of getting 10 percent off, they get 10 percent of the hoped-for volume all in cash up front off, kind of like the car dealers that give you the cash incentive. And then the question is, is it income when received? And as far as I can tell, if they were a cash basis taxpayer, no question about it, their unlimited dominion and control would make it income when received. But they're a cruel basis. And with a cruel basis, you often have expenditures where there's no cash for the expenditure, and you often have cash money that comes in, but it's not income. And it's just ñ putting it in the categories isn't helping me get to the answer. Why should we treat it as income, despite the fact that the tax court says that it was in accord with accepted accounting practices not to treat it as income for purposes of reporting to shareholders? Well, if I could answer ñ if I could respond before answering your question, if I could respond to the example that you gave and to the example that Mr. Carlucci gave. Both of those examples assume a kind of dollar-for-dollar parity between the discount and the cash up front. We don't have that in this case. We may have that. We don't know if we have it. The record doesn't reflect. The record says that a certain amount of cash was paid up front, and according to Westpac, a certain discount was given. One of the contracts states that the cash was paid in lieu of discounts. The other ñ all four contracts state that the cash was paid in consideration of an array of commitments. And I'm not ñ let me emphasize that I'm not saying it was paid as an advertising allowance. Those contracts have separate advertising allowances. The cash, though, was essentially paid as a kind of incentive to do business. We will give you a million dollars, 17 million, 1.7 million, whatever the amounts were. We will give you this amount of money to do business with us, to promote the sale of our product, to use us as your primary supplier, to give us a certain amount of shelf space. There was an array of commitments. We don't know. The record doesn't reflect how that cash up front related to the prices that were charged. Now, there was some rather vague testimony to the effect that if they hadn't done this deal, they would have gotten larger discounts later on. We don't know how much those discounts would have been. All these contracts say is we will give you a competitive price. We'll sell our light bulbs to you at a competitive price or our spices or whatever it is. We have no way of knowing on this record that the entire amount of cash was going to be recouped. Now, the Westpac, rather, in its reply brief said, well, we can assume that it would have been recouped because we committed to buy more than we received. But that does not, nevertheless, that does not establish the kind of relationship that's needed to convert what is simply a contingent repayment obligation for cash on the barrel, as it were, into something akin to a deposit or a loan or even an exact adjustment of the price. And that's where it does become important that you have said, well, isn't it, to say it's akin to a deposit or a loan isn't at all kind of the same. It is not all the same at all. If we don't have evidence that this money was absolutely going to be repaid, then there is the cash that they received is income at the time of receipt. And let me emphasize that we're not saying that the unfettered use was sufficient to make it income. What we are saying, obviously, is that the unfettered use was significant with the cash up front. It certainly did not deprive that money of being income. What would the contract have had to say to meet the requirements that the appellant is stating? For instance, it could have said we are paying you $1 million. This represents we have calculated this amount at the rate of a penny per light bulb, something like that. I mean, they really tied it to a penny. We are giving you one penny off our normal price of light bulbs, which would be 25 cents. We're charging, we'll charge you 24 cents. Therefore, over the course of this transaction, it works out to a million dollars. I mean, we. Well, accepting what the appellant said is true, just, you know, for just our purposes right here. Is his argument correct that it's not income, if that were the case, if the facts were as he's stating them? If these, we would actually not concede that, because as the tax court found, the inventory accounting rules. Well, see, I'm getting confused, because what I was hearing in your argument previously is if all that were true, then it would not be income. And so I'm saying, but now you're saying no, that's not, you know, so. I'm sorry. I don't want it to be a moving target. You know, that's the, you know, at some point it's income, at some point it's not income. And I'm trying to understand what, you know, what, because you're saying the record below does not support what he's saying here. And I understood that to mean what, if the record did support what he was saying, then it would not be income. But now I'm hearing you say, well, even if the record did support what he's saying, he still loses. No, I misspoke. If the discount were, if the discount were indeed a discount that were tied to the purchases, if it essentially were a kind of prepayment of, if it were a prepayment, then I believe it, well, it's, I'm sorry. I'm having trouble answering the question because, indeed, the accounting. Imagine how I feel. I'm sorry. The accounting provisions of the code deal with, deal with a discount that arises contemporaneously with a purchase. And they do not deal with this sort of advance payment. Okay. I'm sorry. I can't answer your question. In the tax court opinion at footnote 7, it said the McCormick and GTE Sylvania contracts contained an express repayment obligation. While Ambassador and American Greetings contracts did not contain such an express provision, it existed implicitly pursuant to industry custom. Upon termination, Westpac issued a $406,000 check to American Greetings as repayment. Westpac never questions its repayment obligation. I'm eliding. Yes. We, therefore, agree with Petitioner that an implicit repayment obligation existed in Westpac's contracts with Ambassador and American Greetings. It looks as though it's established as findings of fact that they did actually have a repayment obligation. So I'm missing exactly what the issue is here. We don't dispute that they had a contingent repayment obligation. We dispute that they had an unconditional repayment obligation. Oh, they don't argue that they did. They say if we sold enough light bulbs and enough greeting cards and enough wrapping paper, we wouldn't have to repay anything because we would have met our volume commitments. And this returns to two points. We agree it's contingent. They have said throughout their brief and reply brief in the appeal, Judge Kline, felt that it's unconditional. It makes a difference. A contingent repayment obligation. I think that's just wordplay. It's unconditional if they don't meet the volume requirements. But it's contingent in the sense that if they meet the volume requirements, they don't have to pay back the cash up front. We certainly agree that it's wordplay to say, as Westpac has, that unconditional and contingent mean essentially the same thing. They do not. It is well established that amounts, earnings that are received subject to a contingent repayment obligation are income at the time received, despite the contingent repayment obligation. I got a little lost in your responses to the questions by Judge Callahan. I think you said at one point, but I'm not sure I got it right, and I want to make sure, that if it were as simple as we sell you the light bulbs for a dollar apiece, we're anticipating you'll sell a million light bulbs, we'll give you 10 percent, we'll give you $100,000 today up front. And for every light bulb you sell under a million, you pay back a dollar. You're conceding that in that case, an accrual basis taxpayer would not have to recognize income when they got the $100,000 up front, and that the only reason recognition is required here in the commissioner's point of view is that it's a whole lot more complicated than that, whether and when and how much money they have to pay back. Have I got this right? Essentially, yes, but also because of the contracts, because of the way the contracts are stated and because they do not establish any precise connection between the amount of money that's paid up front and this supposed discount, they also, by their terms, are resulting in Westpac's receipt of money for an array of commitments. Essentially, Westpac is agreeing to do business with Sylvania or whoever. It is getting money as a kind of incentive payment to do that. The record reflects that these payments were referred to as incentive payments. It reflects that they were cash allowances. It reflects a variety of different terms for different commitments. It is not a straightforward discount arrangement. Westpac has argued that it is that. The record does not reflect that. Given that this money was paid to Westpac for an array of commitments under a contract, that it was subject only to a contingent repayment obligation under well-established principles of what constitutes income and when you tax it, those payments were income upon receipt to Westpac. What about this language in the Sylvania contract here? It says in Paragraph 3 they get $1.7 million paid as follows, and it says that that's the total value of the unearned allowance. And then Paragraph 2 says upon termination, Westpac will reimburse GTE Sylvania on a prorated basis for any portion of the Westpac allowance advanced to Westpac but not earned due to failure by Westpac to purchase at least $17 million in lamps. Why isn't that exactly what you're asking for? I'm sorry. I don't entirely understand. Well, it looks to me as though that's exactly the deal that we discussed as the hypothetical deal, where you said if they did that, that would be okay. They wouldn't have to recognize the income. This last paragraph, last sentence of Paragraph 2 of the contract with Sylvania in activity. Because, again, we don't know the price that they got. We can say they received $1.7 million in exchange. But we need to know as long as we know it's prorated. Well, we do need to know because we don't know what that $1.7 represents. We don't know what it represents. It's like calculating a 20% tip when you pay the waiter. I can tell you that I'm going to give the waiter a 20% tip, even though I don't know what the meal is going to cost. But we do need to know here whether that entire $1.7 constitutes a 10% discount. We don't know that because we don't know the prices that they would have paid. We don't know the price they would have paid for the light bulbs had they not received this amount up front. And we know that they also agreed to use Sylvania as their exclusive or primary supplier to promote the purchase of Sylvania's. So now it's the uncertainty at that point is what you're saying is the problem. Because it doesn't calculate to a certain you don't know what they're going to pay. I'm saying that we don't know what they would have paid but for these discounts. Well, see, I guess what originally it was clear that if the discount happened at the time, everyone could understand. And then I understood the government's position to be, well, if they did this, this, and this, and we knew that they had, it was a certain that they had to repay it if they didn't fulfill, then that would satisfy the government. But now I'm seeing the target move to, well, now since we can't calculate that that $1.7 really means what they say it means, then. No, I'm sorry, Judge Oaks, if I have, if. I'm Judge Callahan. I'm sorry, Judge Callahan. I'm very sorry. I'm sorry. I'm sure about that thing. No, I'm sorry. They look different. Yeah. Am I Judge Callahan? No. I wrote you down in the wrong order. I'm very sorry. That's all right. No, I'm not saying it is still, there is uncertainty built into that agreement whether they will have to repay that money. We don't know. Well, so I guess my question was originally what could they ever do in this type of contract? Could this ever, is there a hypothetical situation that would ever satisfy you as to the certainty? I mean, can they ever do, you know, because I understood when you first got up to say if that's what they were really doing, if that's what the record showed, that's a completely different case. That's not the case we have here, and that wouldn't be income. But then it was, well, no, now if we did have that case, it still would be income. So, I mean, could they ever do what they say they're doing and it would not be income? I mean, we kind of need to know that. The code and the regulations do not provide for accounting for this kind of advanced payment as, as the inventory accounting rules of the code and the regulations do not provide for the treatment that they adopted. What we have here is money that was paid to, money that was paid under a contract in exchange for an array of contractual commitments subject to a contingent repayment obligation. That is under well-established principles, income upon receipt. Well, we've gone way over just because we're so interested in what you were saying. Sorry, and I do realize. You don't have to be sorry. We did it. Thank you. Thank you, counsel. Your Honor, in responding to the government's contention that the evidence presented below didn't establish the discount arrangement, I would point the Court to the excerpt of record at 130, which is the government's brief, which said that the petitioner chose upfront payments in lieu of discounts. Then at excerpt of record 47, the expert report, which said these were advanced discounts and explained, in fact, what the industry did with these discounts. And then the tax court's opinion at excerpt of record 144, which did, in fact, as you pointed out, Judge Kleinfeld, at footnote 7, talk about the repayment obligation. So there's just no dispute that there was an absolute repayment obligation respecting the volume purchase. If you didn't purchase, you had to give the money back. Inexact language below is creating the confusion here, and the reason is this. You don't earn income by purchasing. Yet people use the terms in the contract like they could earn the advance or the discount. The reality is, whether we use the word contingent or non-contingent, there was no question in this situation when you look at the facts that under every single circumstance, the money had to be given back. It just was either given back when you didn't make a volume purchase, on the one hand, you know, completely give it back. I didn't make my volume purchase. Here's the money back. Guaranteed. No guarantee. Got to give it back. On the other side, if I do purchase, what I've got to do is take your money, the advance that you gave me, and my money. I'm always going to use my money. If I wasn't using my money, it would be a different circumstance. But you're always going to have a cost. And so all this is doing is basically giving back in the price, because I'm paying you list price, and I would never pay list price. I would always get a volume discount. And that's why we come around to IPL and Glenshaw Glass, because it really is the court below saw this unfettered use of money and had concern about whether or not that was an increase in wealth. Of course it is. It was an economic benefit to Westpac, but it's not income, because there was no guarantee that they could ever keep this money. They always had an obligation to return the money, either on the one hand through no purchase, or the other hand, taking that $2 that I talked about from the car dealer and taking my $8 and putting it together and giving it to the car dealer on Friday. On Friday, the only difference between Wednesday is I've taken $8 out of my pocket in either case. On Wednesday, if I bought it for $8, which is the discount price, on Friday if I bought it for $8, and I'm giving their $2 back. So what this case is all about is the use of that money for the two days, that $2, and whether or not the use of that money is income. And in this case it is not. The tax court's decision below turns general tax principles on its head. A buyer cannot have income through the purchase of goods. But obviously, for the time period that you have the money before you pay it back or before you get rid of it, you do earn some money on that, right? Great question. Great point. I mean, obviously, we're not fighting over nothing. Okay, that's, you know, that's, you know, if you want to say, you know, a lot of times our job is, you know, everyone wants to hide the ball. Okay, find the pee under the mattress. And, you know, if there were nothing for you to fight over, you wouldn't be here, all right? If it were all the same. IPL answers your exact point. IPL says that absolutely, for example, IPL in that situation had the benefit of the customer's deposit for a period of time. It got to use it, enjoy it, invest it, do whatever it wanted to. Same here. Westpac could do the same thing. We have an economic benefit. But that does not answer the question. That's exactly what IPL said. The Supreme Court said, you've got to look to whether or not there's dominion and control. And they defined that, or the test for dominion and control is whether there was some guarantee that they could keep it. And that's what the IPL case was all about, was looking at IPL and saying, what was their ability to control keeping that money? And in IPL, the court said they didn't really have the ability to control it. The customer could cancel the contract, et cetera. Same here. We have no ability to keep that money. We can't just walk away and keep it. We have an obligation to repay it because we either have to give it back to them when we don't purchase or when we purchase, give them back their money and our money together. And, again, when we say that. But the longer you keep it and the longer that you get to use it, you make some money off of that that is a benefit to you and isn't taxed? Great question. For example, if we had invested the millions of dollars we got as an advance and we earned interest on that, absolutely that would be income to us that we would have to report. But because there's an obligation to repay that money, the money itself can't be deemed income. And that's essentially what the government is saying. You're not quarreling with whether it's a benefit, just whether it's income. And you're saying because we're an accrual basis taxpayer, you take the good with the bad and this is the good. Absolutely saying there's an economic benefit and I agree with the court. We're simply saying the Supreme Court said an economic benefit by itself is not income. I slightly disagree with Your Honor, which is if I were a cash basis taxpayer and I gave my example, I'm in the exact same situation. I disagree with the court. I see. So the implication of the government's argument is that when Ford and General Motors have these incentive sales programs, buy the car for $28,000, get $2,000 cash now and make no payments for six months, the IRS position would be the buyer, all those people that went for the deal, have to pay income tax on the $2,000. That's exactly why you said that, Your Honor. No, it's just they're paying $2,000 more for the car. It's not income. It's just part of the discount package. It's actually not that they're paying $2,000 more. They're getting a discount, in fact, an advance discount. They get the $2,000 up front, but then they pay $2,000 more for the car. List price. And that's exactly what we have here, which is we have a list price, if you will, and we're buying for less than list price. They're giving us that discount and we're giving it right back to them. So we're always buying at that discount. I got this right on what the IRS position would imply on those automobile incentive programs? Again, I haven't asked counsel, but by virtue of their position below, it would have to apply by extension, and that's why this decision is incorrect and erroneous. Thank you. We're going to disrupt our normal procedure because we have some curiosity about that. You're entitled to the last word because you lost the case below, but we're going to ask the IRS counsel, the Commissioner's counsel about that. Please repeat the question. Okay, here's the deal. When the big car manufacturers are trying to move some cars, they have too much inventory on their lot, a lot of times you hear on the radio the ads, and the ads are, come in and buy the car today. You pay no money today. We'll give you a check for $2,000. You don't owe any payments for six months. People come in and buy the car. They get the check for $2,000. They put it in their personal checking accounts. They have full dominion and control over the money. Six months from now, the payments start up on their cars. Since the car manufacturer was willing to sell the car on this deal, if the buyers had en masse said, no, we don't want cash up front, we want cheaper cars, it's reasonable economic inference that the cars would have sold for $2,000 less. But if I understand the IRS position, when we hear that deal over the radio, the IRS is entitled to charge all the buyers of cars who got those $2,000 checks, income tax on the $2,000 checks. Is that true? With respect, that's a question I cannot answer. There is a body of law dealing with automobile sales and rebates. We have not dealt with it in the briefs. If the court would find it helpful, I would be happy to file a supplemental letter brief after the argument addressing that question. We'll let you know if we want any further filings. Thank you, counsel. Sorry to interrupt your rebuttal. No, Your Honor. If there's no further questions, I will rest. Thank you, counsel. Thank you, Your Honor.
judges: Oakes , Kleinfeld, Callahan